Weygandt, J.
Mary F. Freer died July 13, 1901, leaving an estate of approximately $100,000, which is all disposed of in her will made some years before. Her will was duly probated, and George A. Ullman qualified as executor, and on October 14, 1907, filed his first and final account. To this account exceptions were.filed, and upon application the matter was certified to this court for hearing. After making a number of bequests and devises, the testatrix bequeathed all the residue of her estate to trustees for the purpose of establishing a children’s home in and for Ashland county. It appears from this account that this residue amounts to $1.44.
The commissioners of Ashland county, who were to act with the trustees named in the will in the establishment of this home, filed exceptions to this account, excepting to the allowance of attorney ’s fees paid to Judge Campbell, Judge McCray- and Senator Patterson, to the allowance of $9,000 compensation to the executor in addition to the amount allowed him in the will, to the failure of the executor to account for all the rents, profits, and assets of this estate, to his failure to account for interest on funds in his hands while acting as executor, and to his failure to file proper vouchers with his account.
The vouchers filed with this account are merely receipts from the various persons to whom payments were made as creditors or legatees. While these receipts are not what are ordinarily understood to be vouchers, yet I know the practice in many coun *14 ties has been, for the probate court to furnish to executors and administrators just such vouchers and receipts as are filed with this account, and nothing more has usually been required. The account itself briefly indicates for what purpose most of these payments were made, and this, in connection with the receipts filed, I am inclined to hold is a sufficient compliance with the law, in view of the well' known practice in many of our' probate courts.
Exceptors also charge that the executor has failed to account for all the assets, rents and profits of this estate. The evidence falls short of establishing any claim of this kind. As nearly as I can calculate, the rents and profits accounted for by the executor amount to $11,075.56. This does not include the sum of $1,324.34, which is.reported as the net.income from the Freer block. The evidence offered is mere opinion of the various witnesses as to the probable income from the several properties, or the rental value of the different farms. This is too serious a matter to warrant a court indulging in a guess as to the amount for which this executor should account. Therefore, this court will not,' upon'the evidence offered, disturb this account on the question of rents and profits. The same may be said of the charge that the executor has failed to account for all the assets of this estate which came into his hands. If he has failed -to account for any part of the money, stocks or other property of the estate, the evidence fails to show anything unaccounted for.
In what I have said on the question of rents and profits, I have not taken into consideration the rentals'of the Freer block. The account shows only a lump sum of $1,324.34, which- is claimed to be the rentals from this block, after deducting the-taxes, insurance, improvements and repairs. What those improvements or repairs were and the cost of the same does not appear in this account. Those interested are asked ' to be satisfied with the mere statement of a certain sum due this estate with no items of either receipts or disbursements covering a period of five years. If this be a sufficient accounting, why was this estate not saved the expense of this long account by filing a statement that there was the sum of $1.44 remaining in the hands of the executor awaiting the pleasure, of' *15 these trustees and commissioners, who were to erect a children’s home with the amount so remaining after the payment of all the legacies provided for in this will. ■ The evidence shows that one of the business rooms in this block rented for $350 per year, another for $400 per year, and the third room for $450 per year. The rooms on the second floor rented for $75 each after 1904. Prior to that time, two of them rented for $50 per .year, each, and the other for $60 per year. In five years this block yielded to this executor and the other owners of the block, $6,930. The executor was entitled to one-half of this amount. The one-half of the taxes for the same years was $585.60. Deducting the taxes from the one-half of $6,930, leaves a balance of $2,879.40.
As I have already stated, the executor charges himself with the sum of $1,324.34. Deducting this amount from $2,879.40,. leaves the sum of $1,555.06, and what became of it the beneficiaries of this estate are expected to guess so far as I can dis-' cover from an examination of this account. The evidence shows that some part of this was expended for repairs and improvements, but the account" does not.. This executor received this money, and these beneficiaries are entitled to know what he did-with it. It will not do to say that it was honestly expended and that the estate received the benéfits from such expenditure. The law very wisely does not leave these matters wholly to the judgment and honesty of an executor or administrator. Standards of honesty may differ, and those interested in an estate can not be bound by the judgment and discretion of an executor or administrator, unless it has been so wisely exercised as to command the approval of the court to which he is required to give an account of his stewardship. How can a court know or pass upon these matters intelligently -when nothing appears in the account to advise the court how or for what purpose the assets of the estate have been expended. We gather from the evidence that' this executor has books which would explain these expenditures. The intent of the law is that these things should appear in the account for the information of those interested and not be locked up in the strong box of the executor. This law is intended not only for the protection of the estate, but for the protection of-the executor,-his heirs and bondsmen, when he is no longer-here *16 to explain what might otherwise appear to be a misappropriation of the funds of the estate. . This account is insufficient jn this respect, and a supplemental account must be filed within thirty daj^s- itemizing the receipts and expenditures from and for the Freer block.
The executor was called as a-witness, but he refused to testify because he is under indictment for embezzling the funds of this estate. This is a privilege or right the law allows him, and he has a right to avail himself of it if he so desires. It appears from the evidence that he is the only person that might be able to explain some of the matters in dispute in this account. This explanation is withheld because he chooses rather to take advantage of the privilege the law allows him. This is a constitutional right, and no court can invade this right by requiring any citizen to be a witness against himself when charged with crime. Under such circumstances it is difficult for me to find fault with the executor, but I will take occasion to say that Judge McCray and Senator Patterson are also under indictment for the same offense, but they have not hesitated to take the witness stand and testify in this hearing. If a man feels justified in what he hás done, he naturally seeks the first opportunity to make public explanation of his acts and conduct when his honesty and integrity are assailed. I sincerely hope and trust that this executor may be innocent of any criminal intent in this matter, but I am equally free to say that his conduct does not impress one that he has an abiding faith in his ability to honestly and intelligently account for his stewardship, nor does it command him to the favorable' consideration of this court, when called upon to find that his services in the administration of this estate were of extraordinary value.
The testatrix devises her one-half interest in the Freer block to the four sons of her brother-in-law. These sons, as I understand it, already owned the other undivided one-half as heirs or devisees of their father. The executor was required by the will to give possession within five years after the death of the testatrix, and until he yielded up possession to these devisees, I think it was his duty to pay his share of all repairs necessary to maintain the rental values of these rooms as they were at the *17 death of the testatrix, and the estate is properly chargeable with the costs of these repairs. Beyond that he had no right to go. ITe could not improve this block for the benefit of the devisees. This difference is apparent between the improvements made on the Freer block and the improvements made on one of the farms of the testatrix. The improvements made on the barn on the farm would naturally enhance the value of the farm when it was sold later, and the estate would be benefited to that extent. The estate derived no benefit whatever from the improvements made on the Freer block; at least the executor has in no way shown to this court that the estate derived any benefits from these improvements. No higher rents were obtained, and there is no showing that the rents would have been diminished if these improvements had not been made. What were these improvements? Senator Patterson testifies that there were new fronts put in all these rooms on the first floor, and the back room of the bank was repaired; they put in a new floor in the bank, and new fixtures, and a new safe; and he thinks a new vault; everything inside was new; a new-mosaic floor was put in; new carpet in the back room, new plumbing, and walls redecorated. No other conclusion can be drawn from the evidence that that all these improvements were paid for out of the estate of Mary P. Freer—that is the one-half of the cost was borne by this estate. How was this estate benefited bjr such improvements, when the block was specifically devised to Freer brothers ? They alone profit by this expenditure of money and this estate should bear no part of the cost. It would be a most unconscionable rule of equity that would charge up the expense of improving the property of this bank to the orphans of Ashland county. The evidence does not satisfactorily disclose what the cost of these improvements was, but the supplemental account which the executor will be required to file will afford this explanation. AVhatever these improvements cost must be credited to this estate and the executor charged with that amount.
Exceptors also ask that the executor be charged with interest on the cash balances on hand at the end of each year. There is no showing .that he received any interest on any of the funds of this estate, and the will permitted him to withhold distribu *18 tion of the greater part of this estate for five years, and there does not appear in the will any intention on the part of the testatrix that he should account for interest while distribution was delayed. Nevertheless, if he loaned any part of the funds of this estate, while the will contest was pending, or while in his hands awaiting distribution, he should be charged with the interest received. As I have already said, the evidence does not show that this has been done; therefore the exceptions to this must be overruled.
Exceptions are filed to the various allowances for attorneys fees; separate exceptions being taken to each and all of the items. I shall, howeyer, for the sake of brevity, treat this allowance as one sum. The aggregate of the several items is $9,-557.20. Of this amount $2,400 was allowed to Judge Campbell, but he has withdrawn all claim to any part of this, so that said claim will be charged against this executor.
The -remainder ($7,157.20) was paid to Judge McCray and Senator Patterson, for legal services in the action to contest this will, and generally for all services rendered this executor in the settlement of this estate. It is always prudent to secure the advice of an attorney in the settlement of an estate, because executors and administrators are not usually men learned in law; and difficult questions frequently arise in the administration of estates, which may sooner or later involve the estate in costly litigation if the executor or administrator, through ignorance of the law, should go astray. At the same time the estate must not be needlessly burdened with the payment of exorbitant and unnecessary attorney’s fees. The executor must observe the same caution and exercise the same sound discretion in this as in the allowance of any other claim against the estate. The court will examine into these matters as carefully as into any other arising in the settlement of the estate. The court can not control what an executor or administrator may choose to pay for legal services, but it will not permit the estate to be charged with unreasonable fees. -In other words, the court does not fix the amount of the attorneys’ claim against the executor, but it will determine the amount it will allow the executor to charge the estate with, although the amount paid by the executor to his legal advisor may be largely in excess of the amount deemed by the *19 court to be reasonable. This is just and right because the services rendered by the attorney may be more valuable to the executor than to the estate. AArhen he accepts'the trust he is charged with the faithful administration of' that trust before he is entitled to compensation. He may also become liable on his bond, if he fails to administer the estate according to law. For these reasons and others that will suggest themselves, the services of an attorney may be valuable to the executor, but of little or no value to the estate. The courts, however, do not always keep this distinction in mind when making an allowance to an administrator or executor for the services of an attorney in the settlement of estates.
This will was attacked by some disappointed relatives, and the executor assumed the burden of defending or maintaining it. He was successful, and now asks that the estate be charged with the fees of the attorneys employed by him to defend the will. It js urged upon the court that Mr. Ullman deserves great credit for voluntarily assuming the defense of this will for the b.enefit of others who would not have shared in this estate but for the will. It does not appear that the commissioners, the school board or the churches of Ashland manifested much interest in this will contest, although, if the will had been set aside they would have lost the legacies which have since been paid them by virtue of this will. In view of the fact that this will, as Mr. Ullman construed it, as appears from his account, gave him more than $18,-000, thereby making him very largely the chief beneficiary of this will, this coxirt is unable to find that the motive which prompted him to assume the contest of this will was wholly the result of an unselfish desire to protect and maintain the rights of others. However, as I have said, this will was sustained and the estate of Mary F. Freer distributed as she had directed, and 1 am inclined to allow him a reasonable amount for the services of his attorneys rendered in the action to set aside the will, as well as for other services rendered him in the settlement of this estate. It appears from the evidence that he contracted and agreed to pay Judge McCray $8,500 for his services if the will was sustained. The will was sustained and Judge McCray is entitled to his pay according to the contract, so far as this court is concerned, but this estate can not *20 be charged with any such sum for the services so rendered by Judge McCray. Outside of this will contest, I think .the services rendered by Judge McCray were trifling, in view of the fact that the executor had already secured the services of able counsel to direct and advise him as to other questions .that might arise in the collection and disbursement of the assets of this estate. If Mr. Ullman’s business ability^ was such as to ■ command the extravagant compensation allowed him by the testatrix for the settlement of her estate, I can see very little use for the services of an attorney except in the cases of the will con- , test and the suit on the claim of Fanny Gilbert.
A suit to contest a will is always an important one, and when the mental capacity of the testator is questioned, it is usually a difficult one to prepare and try, because the testimony of expert physicians must be secured as well as met in the trial of the case. No one who has not gone through the preparation of a case of this kind can realize or appreciate the labor required to properly prepare for trial, and in this case we must assume that the proper preparation was made because the defense was successful. People generally measure a lawyer’s services by what they see in the court room, when the work done there usually represents but a small part of the work actually done. The successful trial of a law suit does not depend so much upon the conduct of the trial in court as upon the thoroughness of the preparation beforehand. The undisputed evidence in this case shows that McCray and Patterson spent much time in interviewing witnesses, looking after the taking.of depositions, and the investigation of questions of law that would be likely to come up in trial. • All of these .things "should be done in the preparation of a ease for trial, and were done in this instance. The five days consumed in the trial of this case represent but a small part of the labors of these attorneys in this case. For all of this they are entitled to compensation, and their services while' in their offices engaged in the preparation of their case is just as valuable as the services rendered in the court room during trial.
Attorneys were called to testify as to the value of the services ■rendered by Judge McCray and Senator Patterson to this executor. They fix the value of the services of the former at $500 per day, and of the- latter at $400 per day. As to this evidence *21 it is sufficient to say that such compensation for attorney’s services in' this part of the state is never met with in actual practice, and finds no support save alone in the active and fertile imagination of the expert witness. Such fees for such services are grossly unreasonable as measured by the fees honestly obtained by practicing attorneys in this section of the state, and in no reported case that I have examined have any .such fees been allowed for similar services even in larger estates and where the ability of the attorneys would, at least, compare favorably with that of the attorneys claiming these fees in this matter.
Many people have come to regard an attorney’s license to prac-' tice as a license to commit grand larceny with impunity, and such transactions as this unfortunately support this slander against a profession that, for honesty and integrity, ought to rank first of all. Senator Patterson acted as counsel for this executor throughout the settlement of this estate, and is therefore entitled to a larger fee than Judge McCray. As has been urged by counsel, the Children’s Home ought not to be compelled to bear the entire burden of maintaining this will nor the entire expense of administration. In some respects this is true; but some of the beneficiaries of this will would have taken, by operation of law, a larger share of this estate than they receive under this will. Certainly they were not interested in maintaining this will, and ought not to pay any part of the expense of doing so. Many other legatees receive only small sums,' and have already received their legacies, and will not now be charged with any part of these expenses. It appears from this account and the will, that the Children’s Home has already received a farm of ninety-four acres in addition to the $1.44. This farm is probably worth $8,000 to $10,000, and was appraised at something over $7,000. Outside of those who would have been entitled to a share in this estate if there would have been no will, the Children’s Home and this executor are the chief beneficiaries, and upon them must fall the burden of these expenses. The executor has already paid Judge McCray what he contracted'to pay him, and to Senator Patterson what he thought his services were reasonably worth, and so far as this court is concerned, I will not, nor have I any right to disturb their settlement, but this executor will be allowed to charge this estate for the services *22 of Judge McCray the sum of $1,000, aud Senator Patterson for his services, the sum of $1,500, and no more. In respect to these items in this account, he has credited himself with the sum of $7,157.20. I find that this estate should be charged with but $2,500, and this estate must, therefore, have credit for the difference between these amounts, or the sum of $4,657.20, and this executor is accordingly charged with said amount.
Testatrix by her will'allows to this executor 10 per cent, of the appraised value of her estate as compensation, and further provides that after the first year he shall have such additional compensation for managing her estate as shall be reasonable.
The appraised value of this entire estate is $93,632.99. Under the will this executor takes 10 per cent, of this amount, or $9,-363.20. Tn additional to this he charges this estate $9,000 under the further provisions of the will that he shall be allowed such further compensation for managing the estate after the first year as may be reasonable. Exceptors c’aim that the additional compensation charged is unreasonable, and that he ought to account for the difference between a reasonable additional compensation and the additional compensation charged. What then is a reasonable compensation for the management of this estate after the first year? I am unable to find that the services of this executor were materially different from those ordinarily required of persons serving in like capacity. It is true that this estate was much larger than estates usually are in this county, but the law takes care of that by allowing to executors compensation in proportion to the amount of The estate. The compensation provided for the executor by the testatrix is excessively 'large, and much more than this court would allow him were it not for the will. I feel that some additional compensation must be allowed him, because the testatrix has said that it should be done, and I must obey her direction. I know of no better rule to follow in determining what this additional compensation should be than the rule fixed by Section 6188, Revised Statutes. This executor collected and disbursed $43,313.70. The statutory compensation would amount to $986.27, and this is all this court can allow him by way of additional compensation. Were it not for this will it is doubtful whether, under the law, this executor should be al *23 lowed anything for his services. In brief, his account may be summed up in these words:
“I have collected, in round numbers, $43,000. I have paid out the legacies, paid attorneys $9,500, taken over $18;000 for myself, and now have left $1.44, with which the commissioners may build a children’s home. ”
With this balance staring one in the face, should this court say, “Well done, good and faithful servant,” or “take from him the talent which he already has”? I shall do neither, but content myself with sustaining these exceptions to the extent already indicated. It is the duty of courts to jealously guard the administration of estates, and the Ullman method of administration of estates can not be too severely condemned. This woman intended that a substantial portion of her estate should be devoted to the erection of a home for the orphans of Ashland county—a home that would indeed be a monument to her memory. Her benevolent intentions were thwarted by the squandering of her estate.' If she intended the result reached by this executor, she certainly has perpetrated a grim joke upon the people of this county. Who but this executor believes that she had in mind a $1.44 home for the unfortunate children of her county. This shameful extravagance in the administration of estates must cease, and confidence in our courts be restored.
To summarize, the balance due this residuary legatee I find to be as follows:
Balance due, as shown by the account of executor.. $ 1.44
Claim of Judge Campbell withdrawn............ 2,400.00
Overcharge on fees to McCray and Patterson...... 4,657.20
Overcharge by executor for compensation......... 8,013.73
Total ................................. $15,072.37
To this amount must be added when ascertained, the one-half of the total cost of the improvements made on the Freer block. As stated before, the executor must file a supplemental account itemizing the receipts and expenditures in connection with the Freer block, and from this we can ascertain the costs of these improvements. This must be done within thirty days, and ex *24 ceptions thereto may be filed within ten days thereafter, and for that purpose this matter is continued for further hearing upon that question alone. I have found that $1,555.06 of the rentals of this block are accounted for by the executor, and should he fail to file a proper supplemental account within the time allowed him, he will be further charged Avith said sum, and the amount found due this residuary legatee fixed at the sum of $16.-627.43. The executor must be charged personally Avith the costs of this hearing.
On Exceptions to Supplemental Account.
In the former hearing of this matter, the executor was required to file a supplemental account setting out an itemized statement of the receipts and expenditures from the Freer block. This he has done to the entire satisfaction of this court, because it is such an account as, the law requires of executors and' administrators for the information and benefit of those interested in an estate. Exceptions have been filed to certain items of this supplemental account, and from what I stated in my former opinion, certain of those excéptions must be sustained for the reason that the expenditures excepted to are for improvements to this property rather than for necessary repairs.
Exceptions are filed to íavo itenis, of $5 for hauling sand, and $11.50 for brick. It appears from the evidence that a part of the foundation wall of this building had fallen in, and'the sand and brick were used in repairing the same. The exceptions to these two items are overruled. The commissioners except to the allowance of the item of $274.10 for a new roof. At the time of the opera house fire, the roof of this building Avas damaged to such an extent that the insurance companies adjusted the loss, and paid to the exeputor substantially what it cost to put on the new roof. Exceptions to this item will be overruled.
As to the item of $184.93 for a new furnace and chimney, it appears from the evidence that the old furnace had become practically worthless and furnished more smoke that heat to the occupants of the building, and this was- its condition at and before the death of Mary Freer. From the evidence it appears that *25 tbe old furnace lasted about ten years, and as this estate hád the benefit of this furnace for five years, I think it would be equitable and just that one-half of -the cost of this new furnace should be charged in this supplemental account, the estate being charged with but one-half of the amount of the items allowed therein.
The exceptions to all other items are sustained, for the reason that they appear to be improvements rather than necessary repairs. Throughout this account there are many items for wall paper, painting, hardware, and repairs of various kinds, which I think are all that this estate should be charged with. Some claim is made that the rents of the upstairs rooms were increased because of some of these improvements. This may be true in part, but George Freer, who was certainly a very fair and honest witness, says that there was' a general advance of rents in Ashland, and I think whatever increases of rents there was was' due to this rather than to certain improvements, which were, no doubt, very acceptable to the tenants, but not of sufficient importance to warrant the claim that the increase in rents was wholly due thereto.
In my former finding, the executor was charged with the sum of $15,072.37, exclusive of what might be found unaccounted for from the rents of the Freer block. It is, therefore, the finding of this court that there is due the residuary legatees, the commissioners and the trustees for the Children’s Home, as follows:
Balance by former finding....................$15,072.37
C. W. Rolling, furnace-and chimney, y2.. .$ 92.47
Soles Bros., plumbing................... 17.40
MeCready Hardware Co., glass......... 103.00
Shearer, Kagey & Co., front........... 205.00
MeCready Hardware Co., skylight, glass.. 105.30
Christ Jensen, frescoing................ 340.00
Soles Bros., plumbing.................. 105.00
Thomas, papering and painting........ 46.25
Beach & Brown, wall paper............ 25.00
Thos. McNeeley, bank front............ 225.45
Ashland Hardware Co., stove........... 30.23
Total $1,295.10
*26 One-half of $1,295.10, said estate having paid but
one-half of said items....................$ 647.55
Total ..................................$15,719.92
Interest from Oct. 14, 1907, to July 20, 1909... .$ 1,666.31
Whole amount of judgment to date............$17,386.23
It being conceded that all other legacies have been paid in full, and that whatever amount is found due from the executor is to be used to erect a children Vhome for Ashland county, it is ordered that within thirty days from this date, said executor pay 'Over to the commissioners of Ashland county, said sum of $17,386.23, with interest at 6 per cent, from this date, to-wit, July 20, 1909, and that George A. Ullman personally pay all the costs in the hearing on the exceptions to this account and execution is awarded therefor.
Motion for new trial overruled. Judgment and decree to date from July 20, 1909.